**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| MARIA B. HILYCORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:11-cv-1159-TWP-TAB |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF THE | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff, Maria B. Hilycord ("Mrs. Hilycord") filed this action seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her Disability Insurance Benefit ("DIB") under the Title II of the Social Security Act. 42 U.S.C. 416(i). For the reasons set forth below, the Commissioner's decision is AFFIRMED.

**I.   Background**

Mrs. Hilycord was born on August 23, 1963, making her 43 years old at the alleged onset date of disability, July 21, 2007. R. at 10; R. at 172. She has a bachelor's degree and worked as a manager of systems analysis in the budget office of Indiana University ("IU") from 1995 through July 20, 2007. R. at 35; R. at 184; R. at 195.

**A.   Procedural History**

Mrs. Hilycord filed an application for DIB on July 17, 2007, alleging she became disabled on July 21, 2007. R. at 190. The claim was denied initially on October 11, 2007 and upon reconsideration on January 24, 2008. R. at 94; R. at 101. Thereafter, on February 19, 2008, Mrs. Hilycord filed a written request for a hearing where she appeared and testified on

May 26, 2010, in Indianapolis, Indiana before Administrative Law Judge John Metz ("the ALJ"). R. at 104.  On June 25, 2010, the ALJ issued his decision finding that Mrs. Hilycord was not disabled.  R. at 7.  On June 24, 2011, the Appeals Council denied review of the ALJ's decision. R. at 1.  The ALJ's decision is therefore the final decision of the commissioner for purposes of judicial review.

**B.   Medical History**

The earliest reported relevant medical history for Mrs. Hilycord begins in 2002, when she was diagnosed with dermatomyositis by her rheumatologist, Thomas Worster, MD ("Dr. Worster"), R. at 424; R. at 442.  Dr. Worster's March 2006 note mentions prior diagnoses of fibromyalgia, but the exact date of that diagnosis is unknown.  R. at 373.  Mrs. Hilycord submits that the diagnosis was "around December 2002."  R. at 422.

In her testimony during the hearing, Mrs. Hilycord stated that in 2004, due to her illness, IU granted her Wednesdays off of work under the Family Medical Leave Act ("FMLA") to allow her an opportunity to rest in the middle of the week.  R. at 68-69. On Wednesdays, Mrs. Hilycord would sleep until noon or 1:00 p.m.  R. at 70.  She would then call in to work to see if anyone needed assistance.  R. at 70.  She further stated that she would handle any related responsibilities from her computer or telephone.  R. at 70.   After any needed tasks were completed, she would return to bed.  R. at 71.

On February 22, 2006, Mrs. Hilycord underwent an MRI of her cervical spine conducted by Jamie Bales, MD ("Dr. Bales"), a neurologist.  R. at 360-61.  The MRI showed that at the C4-5 level, Mrs. Hilycord had disc bulging that abutted and possibly minimally flattened the spinal cord. R. at 361. At the C5-6 level, it also showed a disc bulge and osteophyte complex that caused moderate to severe narrowing of the left neural foramen with suspected impingement of

the exiting left C6 nerve root.  R. at 361.  Dr. Bale diagnosed Mrs. Hilycord with disc disease in the lower cervical spine with left sided stenosis and referred her to a chiropractor, Mary Ann Bough, D.C. ("Dr. Bough").  R. at 375; R. at 333.

Mrs. Hilycord saw Dr. Bough for the first time on March 6, 2003.  R. at 260.  She presented arm numbness and weakness as well as constant neck and back problems to Dr. Bough.  R. at 333.  Dr. Bough thus began treating Mrs. Hilycord at least once per week.  R. at 62; R. at 277; R. at 333-34.

On November 9, 2006, during one of her regular chiropractic sessions with Dr. Bough, Mrs. Hilycord expressed pain and burning in her hands and upper back.  R. at 348.  Dr. Bough requested another MRI of her cervical spine.  R. at 346-47.  At the C4-5 level, the MRI showed a "broad-based disc protrusion that compressed the thecal sac and minimally flattened the ventral aspect of the spinal cord."  R. at 346.  Dr. Bough acknowledged Mrs. Hilycord's overall improvement due to her treatment. R. at 348. Nevertheless, she referred Mrs. Hilycord to Rebound East on November 10, 2006 for concurrent evaluation and treatment because Mrs. Hilycord stated that she still had numbness in her arms.  R. at 348.

Mrs. Hilycord saw, her rheumatologist, Dr. Worster, on July 19, 2007.  R. at 378.  She described pain in her hands, right hip, right buttock, and lateral hip area.  R. at 378.  She also complained of fatigue and difficulty with concentration.  R. at 378.  On examination, Dr. Worster found that the "right hip had good motion", yet "tenderness of the buttock area and the right lateral hip as well as multiple tender points throughout the muscles of the neck, upper and lower back areas." R. at 378. He attributed this pain to "chronic right hip bursitis and piriformis syndrome" and just refilled her Ultracet medication.  R. at 378.  Despite her expressed painful symptoms, Mrs. Hilycord mentioned to Dr. Worster on this visit that she was going to Hawaii for

3

vacation and would be going from island to island.  R. at 378.  She asked for and was prescribed scopolamine to help with motion sickness if needed.  R. at 378.

In July 2007, Mrs. Hilycord's supervisor told her that IU would no longer allow her to have Wednesdays off at home to rest and do a little work.  R. at 378; R. at 442. Without that arrangement, Mrs. Hilycord believed she was unable to do the job.  R. at 194; R. at 378.  Her last day of work was July 20, 2007.  R. at 194.  Her alleged onset date for DIB is July 21, 2007.  R. at 10.

On August 4, 2007, Dr. Bough completed an Attending Physician's Statement at the request of the SSA for Mrs. Hilycord's DIB.  R. at 350-51.  Mrs. Hilycord's diagnosis included dermatomyositis, fibromyalgia, and cervical disc disorder.  R. at 350.  Dr. Bough listed Mrs. Hilycord's symptoms as "neck stiffness and pain, sleeping problems, back pain, tension, pins and needles in arms, left arm numbness, numbness in fingers, fatigue, pinched nerve, dermatomyositis, fibromyalgia, restless leg and carpal tunnel syndrome."  R. at 350.  Dr. Bough further wrote that work "would not be advisable" for Mrs. Hilycord.  R. at 351.  This assessment was based on Dr. Bough's evaluation of Mrs. Hilycord's "[i]nability to remain in constant position (standing or sitting) due to spinal subluxation, extreme fatigue."  R. at 351.  Dr. Bough selected that she expected Mrs. Hilycord's symptoms to improve, but she did not know when that would happen or when Mrs. Hilycord would be able to return to work due to the "complexity of concomitant health problems.  R. at 351.

On August 23, 2007, Mrs. Hilycord left a message with the Social Security Administration's ("SSA") disability adjudicator stating that she had just returned from vacation and would complete her self-evaluation paperwork on the following day.  R. at 203.  On August 24, 2007, Mrs. Hilycord completed forms for the SSA about her daily activities.  R. at 205-08.

She stated that she did her own laundry on a regular weekly basis, which could take up to two hours or more if she ironed.  R. at 206.  She also listed that she rarely cooked or did crafts.  R. at 205-06.  Mrs. Hilycord further declared that she occasionally drove herself only short distances if needed, but typically "got around by getting rides".  R. at 207.  She stated that her husband, Mark Hilycord ("Mr. Hilycord"), would escort her grocery shopping.  R. at 207.

On August 26, 2007, Mr. Hilycord completed a form about Mrs. Hilycord's daily activities for her DIB.  R. at 209-19.  He expounded on several of the activities Mrs. Hilycord stated were limited.  He noted that she would "fix food" and "did dishes" once or twice a week.  R. at 212-13.  He also declared that she did the laundry four or five times a week, ironed for about an hour per month, scrapbooked, and used the leaf blower outside.  R. at 213.

On October 10, 2007, the State Agency completed their Physical Residual Functional Capacity Assessment ("RFC") for Mrs. Hilycord.  R. at 451.  It determined that Mrs. Hilycord could lift and carry up to 20 pounds occasionally and 10 pounds frequently, stand and walk in combination for six hours in an eight-hour day, and sit six hours in an eight-hour day.  R. at 452. This determination was reaffirmed on January 22, 2008.  R. at 561.

On October 16, 2007, Mrs. Hilycord complained of pain and swelling "across her MCP's and PIP's" to Dr. Worster.  R. at 481.  The metacarpophalangeal ("MCP") and proximal interphalangeal ("PIP") are joints located in the hand.  Ian Y Y Tsou et al., *Rheumatoid Arthritis Hand Imaging*, MEDSCAPE.COM, http://emedicine.medscape.com/article/401271-overview (last updated May 25, 2011).  She also discussed her continued right hip and lower back pain.  R. at 481. On examination, Dr. Worster found "1+ tenderness" in the MCPs and PIPs with no appreciable swelling and that the right hip had good motion with moderate tenderness.  R. at 481. He, however, did assign her physical therapy.  R. at 481.

5

Mrs. Hilycord began physical therapy at Bloomington Hospital Rebound Rehabilitation on October 23, 2007 and continued through December 13, 2007.  R. at 499.  On initial review Mrs. Hilycord expressed pain and discomfort aggravated by sitting, standing, using stairs, sleeping, and walking to the rehabilitation clinician, Marie DeWolf ("Ms. DeWolf").  R. at 524. Following evaluation, Ms. DeWolf, opined that Mrs. Hilycord's prognosis was good and her pain could be managed and decreased within a four week time frame if she adhered to the agreed upon self-management program. R. at 527. This program included Mrs. Hilycord not only continuing aquatic therapy and electrical stimulation, but also implementing a home exercise routine.  R. at 528.

On October 29, 2007, Mrs. Hilycord met with general practitioner Michel Porvaznik, M.D. ("Dr. Porvaznik") for the first time.  R. at 490.  On examination, Dr. Porvaznik noted Mrs. Hilycord had decreased breath sounds and a few wheezes, affirmed that her dermatomyositis was fairly stable with her present medication, her asthma and allergy were fairly well controlled, and her affective disorder and chronic itching was being treated with Effexor and Remeron.  R. at 490.  He listed no additional treatment, medication, or changes in the treatment she was already assigned.  R. at 490.  Afterward, he scheduled a six month follow-up.  R. at 490.

The next day, October 30, 2007, Mrs. Hilycord attended her second therapy session with Ms. DeWolf.  R. at 535.  Mrs. Hilycord initially expressed pain in her right lower back and down into her hip.  R. at 535.  However, by the end of the session, Ms. DeWolf was able to neutralize it and stated that they would "continue per plan of care."  R. at 535.  Overall, on November 26, 2007, Ms. DeWolf affirmed that Mrs. Hilycord's pain had decreased; however, she noted that Mrs. Hilycord stated she would have her good days and bad days.  R. at 507.

On December 13, 2007, Mrs. Hilycord answered more questions regarding her daily activities for her DIB claim. R. at 230. Her activities had decreased to wearing clothing with no side zippers, limiting her cooking to only salad preparation, no household chores, and only going to the grocery store with her husband. R. at 230. She stated that she no longer did household chores because of pain and fatigue. R. at 230.

On January 10, 2008, Sterling Doster, M.D. ("Dr. Doster"), evaluated Mrs. Hilycord due to pain and tingling in her right hand. R. at 560. He diagnosed Mrs. Hilycord with carpel tunnel syndrome and noted that the release surgery's chance for success is compromised due to her "mixed bag" presentation including her "moderately severe to severe spinal stenosis and spondylosis." R. at 560. He did not attempt to convince nor dissuade Mrs. Hilycord from the surgery. He did, however, note that Mrs. Hilycord's "other problems were quite normal." *Id.* She had no allergies and had a "little asthma." R. at 560.

On January 30, 2008, Mr. Hilycord was asked to complete another form regarding Mrs. Hilycord's daily activities for her DIB. R. at 234-44. He stated that she did continue to do the laundry two to three times per week for herself. R. at 238. He noted that she did nothing in the kitchen other than bake brownies or cookies once per month. R. at 237. He stated that she did not do other housework because of her allergy to dust and cleaning products. R. at 238.

On February 22, 2008, Mrs. Hilycord answered another questionnaire for her DIB about her daily activities. R. at 254. She stated that she rarely attempted household chores because of depression, fatigue and pain throughout her body. R. at 254. She noted that she wore simple, pull-on clothing most of the time because she had trouble manipulating buttons, snaps, and zippers due to a lack of sensation in her fingers. R. at 254.

At the request of Mrs. Hilycord, Dr. Bough completed a Physical Capacities Evaluation for Mrs. Hilycord on March 11, 2008.  R. at 564-66.  From the listed selections, Dr. Bough wrote that Mrs. Hilycord could not stand and walk for more than two hours total in an eight hour work day and needed the opportunity to alternate sitting and standing.  R. at 565.  She further indicated that Mrs. Hilycord could not perform fine manipulation with her hands and could only do repetitive motions with her hands for a short period of times.  R. at 565.  Dr. Bough expressed that Mrs. Hilycord could only occasionally lift no more than five pounds, had a severe restriction against exposure to fumes, and a moderate restriction against driving.  R. at 565-66.  Dr. Bough also indicated that Mrs. Hilycord had a medical basis for her fatigue, dermatomyositis and fibromyalgia, which prevented her from working full-time in a sedentary job.  R. at 566.

On July 10, 2008, at the request of Mrs. Hilycord, Dr. Porvaznik completed a physical capabilities form.  R. at 598-602.  He stated that Mrs. Hilycord was unable to lift or carry any weight at any time and that she could only sit or stand for less than one hour at a time.  R. at 600.  Dr. Porvaznik also stated that Mrs. Hilycord's pain was to the extent that it would prevent her from working full time at even a sedentary position.  R. at 601.

Mrs. Hilycord was treated by Dr. Worster for right lateral hip pain and continued left knee pain on January 26, 2010.  R. at 649.  At her visit with Dr. Worster, Mrs. Hilycord stated that the cortisone injections into her left knee given to her by Dr. Doster no longer seemed to be helping.  R. at 649.  Apparently, sometime in late 2009, on her own accord, she began using a cane due to this knee challenge. R. at 16, 32. Dr. Worster discussed Synvisc and stated that those injections should be considered in the future. R. at 649. He then changed her pain medication from Ultracet to Darvocet.  R. at 649.  She also informed him that she had an appointment with

Jonathon Surdam, M.D. ("Dr. Surdam"), an orthopedic surgeon, about a possible left knee replacement.  R. at 649.

On February 11, 2010, Mrs. Hilycord saw Dr. Surdam for evaluation of both of her knees.  R. at 653-55.  Dr. Surdam took x-rays of both knees.  R. at 656.  According to Dr. Surdam, x-rays of the right knee showed "moderate to severe" patellofemoral degenerative change.  R. at 656.  Similar changes, only more pronounced, were found in the left knee.  R. at 654.

Dr. Surdam noted that he and Mr. and Mrs. Hilycord discussed at lengths the surgical and nonsurgical options concerning her knee.  R. at 654.  He stressed the importance of weight loss and how he believed that "it really play[ed] into all of her joint pain at this point."  R. at 654.  However, Mrs. Hilycord decided to proceed with a total knee replacement on the left.  R. at 654.  They discussed, among many other things, the expected time of recovery, although that precise time is not mentioned in Dr. Surdam's records.  R. at 655.  Dr. Surdam further noted that they also would consider replacing the right knee at some point down the road if it became more symptomatic. R. at 655.  He stated that this would only occur if Mrs. Hilycord "gets serious about losing some weight".  R. at 655.

Dr. Surdam performed the surgery on May 3, 2010.  R. at 756.  Mrs. Hilycord testified that after the surgery, Dr. Surdam said that the knee was much worse than he had anticipated.  R. at 75. In the Operative Report, Dr. Surdam wrote that his findings included "severe medial, severe lateral and severe patellofemoral arthritis."  R. at 756.  He added that Mrs. Hilycord "had significant erosion and degenerative changes associated with primarily the patellofemoral compartment."  R. at 757.  He found the surgery was more complex than usual because of Mrs. Hilycord's increased body mass and obesity in addition to the severity of her arthritis.  R. at 758.

C.      The Administrative Hearing

1.      Mrs. Hilycord's Testimony

The Administrative Hearing was held on May 26, 2010.  R. at 10.  Mrs. Hilycord was represented by Robert Edwards, a non-attorney, and testified to her abilities and limitations before and after her total knee replacement surgery in May.  R. at 10.  She stated that she drove once per week and that would be two or three miles at a time before her knee surgery.  R. at 33. As a manager of systems analysts, she said she lifted and carried approximately 10 to 15 pounds. R. at 36.  She affirmed that she stopped working on July 20, 2007 because she was unable to do the job.  R. at 36.

Mrs. Hilycord testified that her hindering medical problems included dermatomyositis, fibromyalgia, and others she could not remember.  R. at 37.  She stated that she did have asthma, but it was being controlled with medication as well as being alleviated by her continued chiropractor sessions.  R. at 38, 62. The ALJ asked Mrs. Hilycord to discuss all of her various medications, which she stated along with their assigned dosage amounts. R. at 40-41. She discussed Darvocet being the only medication that induced a side effect of not being able to concentrate or focus and fatigue.  R. at 44.  Yet, she affirmed that none of her doctors affirmed that those side effects were directly attributable to that medication.  R. at 45.

Mrs. Hilycord testified that she was able to stand for 10 to 15 minutes before she would need to sit down.  R. at 45.  She stated that she could not walk six blocks without resting before her surgery and could not walk two blocks without sitting and resting after her surgery.  R. at 46. She, however, did agree with Dr. Worster's assessment of her ability to walk for 30 to 45 minutes.  R. at 65.

Mrs. Hilycord stated that she is able to get into a walk-in shower and bathe herself.  R. at 52.  She also noted that she only uses garments that do not have buttons and she did not wear shoes with laces prior to her surgery and today she is wearing tennis shoes.  R. at 52-53.  Mrs. Hilycord testified that she did not cook.  R. at 54.  She did state that she loaded the dish washer and did put the laundry in the washer.  R. at 54.  When asked why Mr. Hilycord's assessment in January 2008 of her activities around the house included more than she has stated, Mrs. Hilycord ascribed her decline in activity to her "episodes".  R. at 61-62.

Mrs. Hilycord stated that she thought her biggest reason why she could not work was because she could no longer concentrate.  R. at 61.  She had earlier testified this lack of concentration was mostly due to her medication, Darvocet.  R. at 44.

### 2.    Medical Expert Testimony

The medical expert, Dr. Lee Fischer ("Dr. Fischer"), testified after Mrs. Hilycord during the hearing at the ALJ's request.  R. at 78.  On review of Mrs. Hilycord's medical records based on medically acceptable clinical laboratory diagnostic techniques, Dr. Fischer listed Mrs. Hilycord's impairments to include dermatomyositis, fibromyalgia, migraine headaches, osteoarthritis in both knees, carpal tunnel syndrome, cervical spine disease and hypertension.  R. at 78-79.  With these impairments, however, Dr. Fischer stated that Mrs. Hilycord would still be able to occasionally carry 20 pounds and frequently carry 10 pounds.  R. at 79.  She is able to sit, stand, and walk two hours each through an eight hour day, and sit, stand and walk six hours each in an eight hour day.  R. at 79.  He mentioned that she should be able to bend, crouch, and crawl occasionally as well as drive frequently.  R. at 79.  She, however, should avoid "concentrated exposure to fumes."  R. at 79.

Dr. Fischer testified that these abilities were limited after total knee replacement surgery to that of sedentary work.  R. at 80.  He stated that it would take no more than three months to recuperate from surgery and get back to sedentary work.  R. at 81.  Dr. Fischer responded to the ALJ's direct question regarding when the sedentary RFP would be applicable.  R. at 84.  Dr. Fischer replied six months prior to surgery, which would have been around December 2009.  R. at 84.

Dr. Fischer also noted that he did not see the cane mentioned in any of the records, but "certainly from January of 2010 . . . when she started to get evaluated for her knee problem . . . it would have been reasonable that she would have used a cane starting about January 2010, although it's not in the doctor's records."  R. at 82.

Dr. Fischer testified that Mrs. Hilycord's medication would not have the side effects of "mov[ing] slower" or "difficulty focusing on task", that there is no study that would support such a side effect, and that Mrs. Hilycord was actually able to work several years on the medication prior to her onset date.  R. at 86.

### 3.      Vocational Expert's Testimony

Vocational expert, Robert Barber ("the VE"), also appeared at the hearing at the ALJ's request.  R. at 157.  The VE was asked if he "[reviewed] the exhibits for the testimony given to me [the ALJ] today."  R. at 85.  He responded, "Yes, sir." R. at 85.  He classified Mrs. Hilycord's past relevant work as "sedentary."  R. at 85.

The VE testified that a person of Mrs. Hilycord's age, education, and work experience with the "limitations alluded to by Dr. Fischer" could perform Mrs. Hilycord's past relevant work, R. at 86.  He also stated that if she could not do her past relevant work there several other sedentary type jobs she could perform based on that hypothetical.  R. at 87.

On cross-examination, the VE acknowledged that if that same hypothetical worker was limited to only occasional use of her hands for handling and fingering, the jobs identified by the VE could not be sustained.  R. at 88.  The VE also noted that if the ALJ's hypothetical worker would miss two to three days per month, all employment would possibly be eliminated,  R. at 88, (stating that "It would vary from employer to employer.").

## II.  Standard of Review

In reviewing an ALJ's decision, the Court does not try the case *de novo* or replace the ALJ's finding with the Court's own assessment of the evidence.  *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir.1989).  The findings of the Commissioner as to any fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000).  Thus, the question before the Court is not whether a plaintiff is, in fact, disabled, but whether the evidence substantially supports the ALJ's findings and is otherwise free from error. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether a plaintiff is disabled, the Court must affirm the ALJ's decision denying benefits. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).  Finally, the Court gives considerable deference to the ALJ's credibility finding and will not overturn it unless "the record 'compels' a contrary result." *Borovsky v. Holder*, 612 F.3d 917, 921 (7th Cir. 2010).

### III. <u>Discussion</u>

**A.      The ALJ's Findings**

The ALJ issued his decision on June 25, 2010.  R. at 20.  He found that Mrs. Hilycord did

meet the insured status requirements of the Social Security Act through December 2011 and that

she has not engaged in substantial gainful activity since July 21, 2007, the alleged onset date.  R.

at 12. The ALJ found that Mrs. Hilycord had several severe impairments that significantly

interfered with her ability to perform basic work. R. at 12. These impairments included

migraines, dermatomyositis, fibromyalgia, asthma controlled with medications, obesity, bilateral

knee osteoarthritis, carpal tunnel syndrome, and hypertension.  R. at 12. The ALJ concluded,

however, that Mrs. Hilycord's impairments or combination of impairments did not meet or

medically equal any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  R. at

14.  He considered Listings 1.02, 1.04, 3.02 and 8.02.  R. at 14.

> The ALJ's RFC finding, however, concluded that Mrs. Hilycord
>
> has the residual functional capacity to perform a range of work described as
> follows. She can lift/carry 10 pounds frequently and she can lift/carry 20 pounds
> occasionally. She can stand for 2 hours at a time for a total of 6 hours during an 8-
> hour workday; she can walk for 2 hours at a time for a total of 6 hours during an
> 8-hour workday; and she can sit for 2 hours at a time for a total of 6 hours during
> an 8-hour workday. She can occasionally bend, stoop, kneel and climb stairs and
> ramps. She can never climb ladders, ropes and scaffolds.  She can occasionally
> work at unprotected heights and around dangerous moving machinery.  She can
> frequently drive. She should avoid all exposure to respiratory irritants such as
> fumes, gases, dust, etc. She can use her hands and arms for grasping, holding and
> turning objects.  She can do no repetitive reaching overhead bilaterally but she
> can occasionally reach overhead.

R. at 15; footnote omitted.

The ALJ considered the evidence on record regarding Mrs. Hilycord's stated subjective

complaints and allegations to reduce her RFC to the extent that they were supported by and were

consistent with the record as a whole.  R. at 17.  The ALJ found that her argument that she has

"intense, persistent, and limiting pain and other symptoms that preclude[d] her from all basic work activities [was] not reasonably born out of the record." R. at 17. He stated that she was not a credible witness because she did more activities of daily living than she admited. Her use of a cane was not supported by the medical evidence. The medical evidence did not support her testimony that medication causes her to lose concentration and focus. There is evidence that Mrs. Hilycord stopped working for reasons not related to the allegedly disabling impairment and she was able to work from 2002 to 2007 despite her impairments. Finally, her testimony about the recovery period from total knee replacement surgery being a year was different than Dr. Fischer's medical opinion of three months to return to sedentary work. R. at 17.

Pointedly, the ALJ assigned significant weight to the testimony of Dr. Fischer. He stated that Dr. Fischer's findings were "well supported in the medical record and are most consistent with the totality of the evidence." R. at 17.

In contrast, the ALJ gave no weight to the opinion of Dr. Bough. R. at 18. The ALJ did note that he "carefully considered the evidence furnished by Dr. Bough". R. at 18. He stated that Dr. Bough has "special knowledge and insight into the severity of the claimant's impairment and how it affects her ability to function." R. at 18. However, the ALJ gave Dr. Bough's assessment "no weight" because Dr. Bough is a chiropractor and stated that under the current regulation "only 'acceptable medical sources' can give medical opinions." R. at 18.

Finally, the ALJ concluded that Mrs. Hilycord could perform her past relevant work as a manager of systems analyst. R. at 19. He further concluded that although the Medical-Vocational Rules as a framework supports a finding that the claimant is not disabled, Mrs. Hilycord has transferable skills to other work within her RFC that exists in significant numbers in the national economy. R. at 19. He relied on the VE's testimony that a person with Mrs.

15

Hilycord's age, education, work experience, and RFC would be able to perform the requirements of representative unskilled occupations in the State of Indiana such as a general office clerk, hand packager, and paramutual ticket checker.  R. at 19.

**B.    Analysis**

Mrs. Hilycord challenges the ALJ's decision for the following reasons: (1) the hypothetical question upon which the denial is based did not contain all of the limitations found by the ALJ for Mrs. Hilycord, (2) the ALJ gave no weight to statements from Dr. Bough because he is a chiropractor, and (3) the ALJ's credibility determination was patently wrong.  All three arguments are addressed in turn.

**1.    The Phrasing Discrepancy in the RFC and the Hypothetical Posed to the VE was a Harmless Error**

Mrs. Hilycord argues that the ALJ erred when the hypothetical question posed to the VE did not include all of the limitations found by the ALJ in his RFC.  Specifically, while the ALJ determined that Mrs. Hilycord "should avoid all exposure…" he initially informed the VE to consider the limitations Dr. Fischer alluded to, which included avoidance of merely concentrated exposure to fumes.   She further asserts that the Commissioner is "invoking an overbroad assumption of harmless error" with a *post hoc* argument that the ALJ's findings are wrong because there is no evidence in the record that Mrs. Hilycord's lung impairment would preclude her from performing her past work as a manager of systems analysis.  Pl. Reply Br., Dkt. 14 at 3.

Although the ALJ did not include the misstatement "all exposure to respiratory irritants" in his hypothetical, the VE was able to personally review the record thus making the ALJ's erroneous finding harmless error. The Seventh Circuit Court of Appeals declared in *Jelinek v. Astrue*, 662 F.3d 805 (7th Cir. 2011), that it has "stated repeatedly that ALJs must provide

vocational experts with a complete picture of a claimant's residual functional capacity." *Id.* at 813. The court stated that the "hypothetical questions posed by an ALJ to a vocational expert must include only the physical and mental limitations the judge deems credible." *Id.* However, the omission of some medical evidence deemed relevant may be cured if there is evidence "showing that prior to testifying, the vocational expert reviewed the claimant's record containing the omitted information." *Ragsdale v. Shalala*, 53 F.3d 816, 820 (7th Cir. 1995).

Here, the ALJ asked the VE in the hypothetical to assume the limitations alluded to by Dr. Fischer earlier in the hearing that included Mrs. Hilycord's need to avoid "concentrated fumes." R. at 79. Avoidance of concentrated fumes and avoidance of all exposure to respiratory irritants are strikingly different as pointed out by Mrs. Hilycord. Pl. Br., Dkt. 12 at 18. However, the transcript of the hearing provides ample reason to note that the ALJ also asked whether the VE had reviewed "the exhibits for the testimony given that day" for which the VE replied "Yes, Sir". R. at 85. Distinctly after that question, the ALJ asks the VE to "classify Mrs. Hilycord's past relevant work as identified." R. at 85. The VE testified that he had an opportunity to review the record for himself. The Court is satisfied that the VE considered all of Mrs. Hilycord's impairments even though they were not the same impairments specifically included in the ALJ's hypothetical.

Furthermore, Mrs. Hilycord's understanding of *post hoc* arguments is overbroad. The ALJ's finding that Mrs. Hilycord should avoid "all exposure to respiratory irritants" is not supported by the record and the Commissioner is merely reiterating that fact. A decision is considered harmless if it is predictable with great confidence that the agency would reinstate the decision on remand because the decision is overwhelmingly supported by the record even if the agency's opinion failed to champion that support. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir

2010).   Remand would essentially be a waste of time. *Id.*   However, it is not for the Commissioner to muster enough facts from the record to support a decision that the agency *might* have made had they evaluated the evidence as the Commissioner did in his brief.   *Id.*   In *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943), the Supreme Court held that "where the correctness of the lower court's decision depends upon a determination of fact which only a jury could make but which has not been made, the appellate court cannot take the place of the jury." The same considerations are afforded to administrative orders. *Id.* As pointed out by Mrs. Hilycord, this Court does not reweigh evidence. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

The ALJ's decision to use the limitation of "concentrated fumes" alluded to by Dr. Fischer in his hypothetical question to the VE is overwhelmingly supported by the record.  R. at 85.  There is no reasoning that the ALJ could have embraced from the record that would aid in his conclusion that she should avoid "all exposure to respiratory irritants."  R. at 17.  Dr. Fischer, the medical expert, stated that the environmental limitation for Mrs. Hilycord was the avoidance of concentrated exposure to fumes.  R. at 79.  Moreover, there is nothing in the record that shows her allergies or asthma worsened due to her work and/or after she stopped working.  She has had asthma since childhood, and the record indicates that she is able to control it along with her allergies.   Dr. Porvaznik, Mrs. Hilycord's general practitioner, stated that her asthma and allergies were being well controlled with medication.  R. at 490.  Furthermore, she even testified that her asthma has been alleviated due to her chiropractic therapy.  R. at 62.  Thus, there is no evidence for the Court to reweigh or that the Commissioner is using to bolster the ALJ's reasoning for his finding because none exists.  The Commissioner's misstatement in his RFC of Mrs. Hilycord's need to avoid all respiratory irritants is also harmless error.

18

Therefore, the ALJ's RFC finding that Mrs. Hilycord should avoid "all exposure to respiratory irritants" and not "concentrated fumes" which was used in the hypothetical posed to the VE is harmless error.  The VE had the opportunity to review the record before providing his testimonial opinion regarding the types of jobs Mrs. Hilycord could perform.  Moreover, the finding is overwhelmingly not supported by the record.

**2.    The Chiropractor's report was adequately considered and validly given no weight.**

Mrs. Hilycord also contends that the ALJ improperly gave no weight to the opinion of her chiropractor, Dr. Bough.  To determine the existence of a medically determinable impairment for purposes of establishing whether a claimant is disabled, the ALJ needs evidence from "acceptable medical sources." 20 C.F.R. 404.1513(a). A chiropractor is not an acceptable medical source, but rather an "other source" which "may" be used only to show the severity of an impairment "established by medical evidence consisting of signs, symptoms, and laboratory findings" and how it affects one's ability to work.  *Id.* at § 404.1513(d); *see also Tadros v. Astrue*, 2011 WL 3022302, at *10 (N.D. Ill. July 22, 2011).

District courts have persistently focused on the term "may" in the SSR 06-3, thus affording judicial discretion regarding their reliance on the use of "nonmedical sources".  *See Johnson v. Astrue*, 2010 WL 4625549, at *3 (N.D. Ill. Nov. 2, 2010) (citing *Humphries v. Apfel*, 2000 WL 574536, at *6 (N.D. Ill. May 10, 2000)) (noting that although the regulations permit the ALJ to consider a chiropractor's opinion, the ALJ has discretion to determine the appropriate weight to be accorded to that opinion); *Cooper v. Astrue*, 2007 WL 2904069 (S.D. Ind. Sept. 27, 2007) (holding that while the ALJ must consider the evidence of a chiropractor, he is permitted to find and give other evidence more weight).

19

Moreover, the ALJ's reasoning for how much weight to give opinion evidence from "other sources" should be based on the same factors used to determine the weight given to opinion evidence from "acceptable medical sources".  SSR 06-3p at 1.  These factors include the length of time and frequency the source has seen the individual, how consistent the opinion is with other evidence, the degree of relevant evidence to support that opinion, how well that opinion is explained, whether the source has a specialty or area of expertise related to the individual's impairments, and any other factors that tend to support or refute the opinion.  *Id.*

In this case, Dr. Bough completed an RFC assessment at the request of the SSA on August 4, 2007. R. at 351. She opined that it was not advisable for Mrs. Hilycord to work because of her inability to stay in a constant position due to spinal subluxation and extreme fatigue. R. at 351. In her evaluation completed at the request of Mrs. Hilycord on March 11, 2008, Dr. Bough selected in that report that fatigue from dermatomyositis and fibromyalgia prevented Mrs. Hilycord from working even in a sedentary job full-time.  R. at 565.  She further noted that Mrs. Hilycord could not stand or walk for more than two hours in an eight-hour work day and needs the option to sit or stand.  R. at 565.  Dr. Bough also wrote that Mrs. Hilycord could not perform fine manipulations with her hands and could lift only occasionally no more than five pounds. R. at 565. Nonetheless, although he noted these findings, the ALJ gave no weight to Dr. Bough's assessments because she is a chiropractor and not an acceptable medical source under current regulations.  R. at 18.

While the regulations may permit an ALJ to consider a chiropractor's opinion, the ALJ relied on other medical evidence to support his conclusion.  *See Johnson*, 2010 WL 4625549, at *3.  Specifically, the ALJ gave weight to the findings of Dr. Fisher and the State Agency medical consultants and gave little weight to Mrs. Hilycord's general practitioner, Dr. Porvaznik, all of

20

which are "acceptable medical sources." The ALJ's assessment, as noted by Mrs. Hilycord, is nearly identical to the testimony of Dr. Fisher because "his findings are well supported in the medical record and are most consistent with the totality of the evidence." R. at 17. The ALJ found that Mrs. Hilycord could stand and walk for two hours at a time for a total of six hours during an eight-hour workday. R. at 15. He also determined that she could use her hands and arms for grasping, holding and turning objects and she could frequently lift ten pounds and occasionally carry twenty pounds.  R. at 15.

The assessment of Mrs. Hilycord's general practitioner, Dr. Porvaznik, was given little weight because, according to the ALJ, his determination of Mrs. Hilycord's abilities was contrary to his own records.  R. at 17.  Pointedly, in his medical reports, Dr. Porvaznik states that Mrs. Hilycord's illnesses are well under control.  R. at 490.  However, in the physical capabilities evaluation that was completed at the request of Mrs. Hilycord, he stated that she had severe impairments that would prohibit her from working even a sedentary job.  R. at 600-601.

Mrs. Hilycord cites several other cases that are not in line with this reasoning.[1]  She cites *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008), where the court stated that "[t]he ALJ was not entitled to disregard the 'serious problems' set out in the chiropractor's opinion simply because he is a chiropractor."  Yet in that case, the court held its reasoning was due to the ALJ inadequately supporting any of his findings. *Id.* at 1268. In the case at hand, the ALJ supports his finding by explicitly stating that the testimony provided by Dr. Fischer, which Mrs. Hilycord concedes is exactly what the ALJ listed in his RFC assessment, and the assessment from the State Agency medical consultant is given more weight because it is in line with the

---

[1] The cases Mrs. Hilycord cites are from other circuits whose holdings, while well reasoned, are distinguishable.

evidence provided in the medical records.  Even in, *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007), another case Mrs. Hilycord cites, the court held that ALJ erred by not discussing a clinical nurse specialist's opinion about the severity and functional effects of the claimant's limitations. As noted earlier, in this case, the ALJ provided an adequate discussion of the findings made by Dr. Bough.

The ALJ did not err in not affording any weight to the opinion of Dr. Bough. It is not up to the Court to reweigh the discretion the ALJ used to rely on the evidence he felt was most consistent when taken as a whole. *See Johnson*, 2010 WL 4625549, at *3. Considering the aforementioned findings based on the evidence, the weight given those findings by the ALJ and his subsequent use of his discretion to give Dr. Bough's assessment no weight, the Court finds no reason to question the ALJ's judgment.

### 3.     The ALJ reasonably discredited Mrs. Hilycord's proffered claims of total disability.

Lastly, Mrs. Hilycord argues that the ALJ's credibility determination was patently wrong. The ALJ's decision regarding a witness's credibility will not be overturned unless it is "patently wrong," because the ALJ "is in the best position to determine a witness's truthfulness and forthrightness." *Skarbeck v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). This credibility determination must build a logical bridge from the evidence to the ALJ's conclusion. *Ribaudo v. Barnhart*, 458 F. 3d 580, 584 (7th Cir. 2006).  Mrs. Hilycord states that the ALJ failed to build logical bridges from the evidence to five of the six stated reasons in his decision for determining that Mrs. Hilycord was not credible. The six reasons supporting the ALJ's credibility determination are listed below:

- She does more activities of daily living than she admits;

- Her use of a cane was not supported by the medical evidence;

- The medical evidence did not support Mrs. Hilycord's testimony that her medication causes her to lose concentration and focus;

- She did not stop work because of her allegedly disabling impairments;

- She was able to work from 2002 to 2007 despite her impairments; and

- Her testimony about the recovery period from total knee replacement surgery was different than Dr. Fisher's testimony.

R. at 17.

Mrs. Hilycord does not dispute that the medical evidence does not support her testimony that her medication causes her to lose concentration and focus.  Instead, she relies upon *Allord v. Barnhart*, 455 F.3d 818 (7th Cir. 2006) where the Seventh Circuit held that because the ALJ has some valid as well as  invalid reasons for finding the claimant not credible it was speculative to assume the ALJ would have made the same decision if he had not relied on the invalid reasons. *Id.* at 821.  However, in *Allord*, the Seventh Circuit further stated that the errors would have been thought harmless if no reasonable trier of fact could have believed the witnesses testimony. *Id.* at 821-22. Mrs. Hilycord purports that because five of the stated reasons for finding her not credible were not supported by substantial evidence, the case must be remanded.

### a.   Mrs. Hilycord does more activities then she admits.

Mrs. Hilycord would have the Court believe that the ALJ erred in determining that she did more activity than she admitted to in her testimony. An ALJ may reject a claimant's description of her daily activities if that description is inconsistent with earlier statements by the claimant or other parties in the record.  *See Wolf v. Shalala*, 997 F.2d 321, 327 (7th Cir. 1993) (noting that the claimant's testimony at the second hearing was inconsistent with his prior

testimony as well as not supported by current objective medical evidence).  In *Robison v. Astrue*, 2012 WL 1144821, *11 (N.D.Ill. Apr. 5, 2012), the court discussed how the assessment of the claimant by his mother added to the collapse of his credibility because it showed that he was able to do normal activities of daily living despite his contentions of limitations.  In *Schmidt v. Barnhart*, 395 F.3d 737, 747 (7th Cir. 2005), the court upheld an adverse credibility ruling noting that the claimant's activities of daily living were not consistent with allegations of pain. The ALJ points to Mrs. Hilycord's ability to go on vacation only weeks after her alleged onset date.  He also places emphasis on Mr. Hilycord's assessments that actually show Mrs. Hilycord performing more activities than she admits on her self-assessments. R. at 17.

Specifically, the ALJ highlights the Report of Contact from the SSA updated on August 23, 2007 only weeks after the disability onset date of July 21, 2007.  R. at 17. There Mrs. Hilycord stated that she had just returned from vacation.  R. at 203.  Logically it follows that this is the same vacation to Hawaii that she told Dr. Worster she would be taking on July 19, 2007, only two days prior to her disability onset date.  R. at 378.  Mrs. Hilycord argues that the specific acts that occurred on that trip are not presented in the record and therefore one cannot know to what extent she participated in various activities that would be contrary to her described limited abilities in her later assessment on August 8, 2007.  Pl. Reply. Br., Dkt. 14 at 9.  While this is true, the record does state that Mrs. Hilycord planned to island hop and therefore needed a prescription for scopolamine, a motion sickness drug.  R. at 378.  Additionally, she stated that notwithstanding her right hip and mild knee pain, "for vacation [she] used pain patches and Ultracet", noting no overt challenges during the trip. R. at 205.  This ability to still vacation with the meager assistance of pain patches and her same prescribed medication of four years is inconsistent with her expressed debilitating pain.

24

Mrs. Hilycord urges that she and her husband's assessment differences noted by the ALJ are consistent with disability depreciating effects and not necessarily with a person's lack of credibility.  Pl. Reply. Br., Dkt. 14 at 9.  Some district courts have accepted the idea that it is not unusual for people with disabilities to experience a decrease in their activities over time.  *See, e.g.*, *McClanahan v. Astrue*, 2011 WL 5282674, at 13 (S.D. Ohio Aug. 9, 2011), *amended by McClanahan v. Astrue*, 2011 WL 5282669, at *6 (S.D. Ohio Nov. 2, 2011) (noting that the claimant's increase in depression over time did not necessarily mean that her mental health symptoms were manufactured); *Poe v. Astrue*, 2009 WL 2485994, at *15 (D. Ariz. June 26, 2009) (discussing how the court agreed that the "ALJ did not accurately represent the change in Plaintiff's daily activity level over time").  However, Mrs. Hilycord's argument is flawed because the inconsistency noted by the ALJ is between the assessments of her and her husband taken around the same time and not those taken several months later.

Mrs. Hilycord's assessments depict exaggerated limitations of her abilities when compared to Mr. Hilycord's assessments of her.  Mrs. Hilycord would have the Court believe that her assessments, and those of her husband, regarding her daily activities are essentially identical at each chronological interval as they both show her decline in abilities and that any inconsistencies are minute if not in her favor. The Court agrees that both Mr. and Mrs. Hilycord's assessments show a slight decline in her abilities. They both list that she no longer does crafts.  R. at 205-06; R. at 214; R. at 254; R. at 235.  They are also in accord regarding her decline in doing the laundry.  R. at 206; R. at 230; R. at 213; R. at 237.  However, just as in *Robison*, in both of Mr. Hilycord's reports about his wife's daily activities he list activities being performed to a greater degree than what Mrs. Hilycord's admits.

Mr. Hilycord's assessment of Mrs. Hilycord's daily activities on August 26, 2007 reiterates to a greater extent all of what Mrs. Hilycord stated as her activities on August 24, 2007. He stated that she "fix[es] food" and "did dishes" once or twice a week where Mrs. Hilycord stated that she rarely cooked. R. at 213; R. at 206. He also declared that she did the laundry four or five times a week and not just her own as alluded to by Mrs. Hilycord. R. at 213; R. at 206.

Mr. Hilycord's report on December 13, 2007 differed from Mrs. Hilycord's evaluation on January 30, 2008 as well. He stated that she did continue to do the laundry two to three times per week for herself when Mrs. Hilycord stated in her assessment that she no longer did household chores. R. at 238; R. at 230. He noted that she did not do other housework because of her allergy to dust and cleaning products. R. at 238. Yet, Mrs. Hilycord declared that she did not do those activities because of pain and fatigue. R. at 230.

When the ALJ asked Mrs. Hilycord about discrepancies in her husband's assessment of her abilities, she responded that she declined with each of her "episodes." R. at 61-62. The record, however, does not reflect any other reference to what could be considered an episode.[2]

### b. Mrs. Hilycord has no medically recorded need for a cane and no foundation for the inaccuracy of her knee replacement surgery recuperation time.

The medical records do not support Mrs. Hilycord's self prescribed use of a cane and there is ample evidence that she was aware of a more accurate recuperation time. A discrepancy between the degree of symptoms "claimed by the applicant and that suggested by the medical

---

[2] It would seem that Mrs. Hilycord's abilities were on the incline according to her testimony thus muting her argument of health decrease. Mr. Hilycord in his last assessment declared that Mrs. Hilycord no longer drove. R. at 238. But in her testimony at the hearing, Mrs. Hilycord stated that she drove once a week. R. at 33. She also stated at the hearing that she could shower without assistance as opposed to her previous statement in her assessment that her husband assisted her while she showered. R. at 254.

records is probative of exaggeration." *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04 (7th Cir. 2005).  Mrs. Hilycord's use of a cane is not supported by the medical evidence, which is also affirmed by Dr. Fischer in his testimony.  Dkt. 8-2, R. 82.

Mrs. Hilycord further asserts that considering the ALJ gave "great weight" to Dr. Fischer's testimony in his findings he should also take note of this opinion in the testimony.  Pl. Br., Dkt. 12 at 28.  However, the ALJ only stated that he "gave weight" to Dr. Fischer's testimony and not "great weight".  R. at 17.  Furthermore, what exactly the ALJ relied upon from Dr. Fischer's testimony and applied weight to, respectively, is within the province of the ALJ.

Next, Mrs. Hilycord stated that she was told by her doctors that it would take her a year to recuperate from her elective knee surgery.  R. at 49.  Yet, Dr. Fischer testified that recuperation back to sedentary work after knee surgery would take "no more than three months." R. at 81.  Dr. Surdam stated that he and Mrs. Hilycord spoke at great lengths about the surgery and recuperation. R. at 654. The only grace that can be afforded Mrs. Hilycord's proposed understanding of a year's time for recuperation is the fact that she and Dr. Surdam discussed that they would consider the same surgery for her other knee in a year.  R. at 654.  However, as pointed out by Dr. Surdam in his notes, he told Mrs. Hilycord that second surgery would only happen in a year not due to any recuperation time but if the problem worsened in her other knee and if she lost weight.  R. at 655.  Therefore, Mrs. Hilycord would have been made aware of the actual recuperation time.

Considering the discrepancies with the medical records which did not support Mrs. Hilycord's need for a cane and the great degree of difference in the recuperation time she testified to when compared to Dr. Fischer's testimony, the ALJ properly found Mrs. Hilycord's testimony to be probative of exaggeration and less than credible.

c.   **Mrs. Hilycord's inconsistent statements and continued work support the ALJ's creditably determination.**

Mrs. Hilycord's varying reasons for having to stop working and her ability to continue working after her diagnosis adds to her lack of credibility. When assessing a claimant's credibility, the ALJ may rely on inconsistencies between the claimant's testimony and the evidence in the record. *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir.1989). Specifically, the date that the claimant alleges as an onset date should be the starting point of the analysis, and that date "should be used if it is consistent with all the evidence available." *See* SSR 83-20 at *3. The day when the impairment caused the individual to stop work is also important. *See Id.* Nevertheless, medical evidence is "the primary element in the onset determination," and the date chosen "can never be inconsistent with the medical evidence of record." *Id.* at *2, *3.

As noted by the ALJ, Mrs. Hilycord noted on one occasion that she stopped working because she could no longer work from home. R. at 17; R at 194. At the hearing, she stated that she stopped working because her FMLA had expired and she "couldn't do the job." R. at 36. Later at the hearing, she opined the main reason why she could not work was because she could no longer concentrate. R. at 61. Mrs. Hilycord asks the Court to infer that since she could no longer work from home in an effort to alleviate her impairment impact, she was made to stop working. Pl. Reply. Br., Dkt. 14 at 28-29. However, there is no medical evidence supporting her need to have required the support of FMLA. The record only notes that Mrs. Hilycord took advantage of the coverage, Pl. Br., Dkt. 12 at 4, but it does not show that it was medically suggested or that it would aid in her coping with her symptoms.

She further testified that her lack of concentration was caused by her medication, Darvocet. R. at 44. However, aside from the fact that Dr. Fischer testified that none of her

medication would cause her to have that side effect, R. at 86, Dr. Worster noted in the record that

he did not place Mrs. Hilycord on Darvocet until January 26, 2010.  R. at 649.  Mrs. Hilycord's

alleged onset date is July 21, 2007.

The ALJ also stated that Mrs. Hilycord's impairments were diagnosed several years

before her onset date yet she was able to continue work.  R. at 17.  Mrs. Hilycord argues that this

was only due to her ability to work from home once a week because of FMLA.  Pl. Br., Dkt. 12

at 29.  When her FMLA ended, she felt she could no longer perform her required work duties.

R. at 30. However, there is no medical documentation that supports her need to have taken

advantage of her FMLA option or to subsequently quit working when that benefit ended.

Specifically, on July 19, 2007, two days before her onset date, Mrs. Hilycord told Dr. Worster

that she would be quitting her job because she could no longer work from home and believed she

could no longer do the job.  R. at 378.  Dr. Worster, her long-term doctor who had actually

diagnosed her with several of her ailments did not tell her she should no longer work.  Moreover,

Dr. Provaznik stated on October 29, 2007, that her dermatomyositis was fairly stable with her

present medication. R. at 490. He also noted that her asthma and allergy were fairly well

controlled. R. at 490. These discrepancies between Ms. Hilycord's testimony and the record

support the ALJ's determination that she lacks credibility in this regard.  Therefore, the Court

finds that that ALJ did not err in reaching his credibility determination.

### IV.    Conclusion

For the reasons set forth above, this final decision of the Commissioner of the Social

Security Administration is AFFIRMED.  Final judgment shall be entered accordingly.

SO ORDERED.      07/17/2012

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Timothy J. Vrana
tim@timvrana.com

Thomas E. Kieper
United States Attorney's Office
tom.kieper@usdoj.gov